This is a compensation suit in which plaintiff claims to have been injured while in the employ of one Joe McAllister (or McCallister), who, according to the allegations of the petition, was either a sub-contractor of Gross and Janes Tie Company, or an independent contractor. The defendant is the insurer for Gross and Janes Tie Company.
Defendant's answer denied that plaintiff was ever in the employ of Gross and Janes Tie Company, or that of any contractor or sub-contractor of said Company.
There is no dispute as to the facts with reference to the injury and the sole question involved herein is concerned with a determination of the relationship between Gross and Janes Tie Company and McAllister.
After trial there was judgment in favor of plaintiff awarding compensation at the rate of $17.87 1/2 per week during the period of disability not exceeding 400 weeks, together with $500 for medical and hospital bills, from which judgment the defendant has appealed.
The record establishes the facts that plaintiff was employed by Joe McAllister; that he was injured on June 24, 1946, while working in the course of his duties behind the edger at a tie mill located at Quitman in Jackson Parish, Louisiana; that McAllister was the owner of the tractor type tie mill which he had purchased from Gross and Janes Tie Company for a total consideration of $3,250, of which amount $500 has been paid in cash, the balance of $2,750 being represented by a demand note to the order of Gross and Janes Tie Company, secured by a chattel mortgage on the saw mill. It is also established that at some time before the time of the accident one Dewitt Sanders, an agent of Gross and Janes Tie Company, had negotiated with a Mr. Harvey for the purchase of tie timber located on a 150 acre tract of land in Jackson Parish belonging to Harvey and his brother. The timber was bought by the stick on the basis of Sanders' agreement to pay the Harveys 20 cents per tie for all cross-ties cut from the tract in question. Shortly after these negotiations Sanders and McAllister, accompanied by Harvey, selected a site for the mill and McAllister moved the mill and equipment to said site from a location near Choudrant.
After making his set on the Harvey property McAllister cut ties and also sawed an undetermined amount of lumber from the slabs of timber. All the ties cut and manufactured at the McAllister mill were hauled by the Harvey brothers in their truck to the railway siding, which was the point of delivery to Gross and Janes Tie Company. The company deducted the stumpage of 20 cents per stick, and remitted the same, plus *Page 576 
the cost of hauling at 12 or 14 cents per stick, to the Harveys. The further amount of 20 cents per stick was deducted by the company and credited on McAllister's note. The difference between the total of these amounts withheld and the market price of ties, which was in the neighborhood of $1.25 each, was paid to McAllister.
The lumber which McAllister salvaged and sawed in the course of his operations in sawing cross-ties was sold by him to a dealer by the name of Barrett.
Some time after the accident, which is the cause of this suit, McAllister sold his mill to Barrett, the consideration being the assumption by the purchaser of certain debts, including the unpaid balance of the Gross and Janes note, and an additional sum of a few hundred dollars which was paid to McAllister in cash.
The sole issue before us is whether, on the basis of these facts, McAllister was in truth an employee or a contractor of Gross and Janes Company. If the facts justify an affirmative answer, then, unquestionably, the defendant herein, as the insurance carrier of Gross and Janes, is clearly liable for compensation.
In a written opinion our learned brother of the District Court summed up his reasons in these words:
"I am impressed that the entire arrangement made in this case by and between Gross and Janes Company and the alleged operator of the mill, so far as Gross and Janes was concerned, was a refined scheme to shield itself from liability for compensation in case of injuries resulting from the operation of these mills, and the longer it could continue such operations, it would perhaps save insurance premiums by not reporting and paying premiums on the wages earned by employees in these mills.
"If such is not the case, then the information is in the hands of the defendant's principal and insured who assisted the defendant in the defense of this case and I would think it certainly in better position to present the evidence on the point than the plaintiff who, of course, had not possession of the evidence and facts peculiarly in the hands of the defendant or of its principal who assisted it in the defense of this case."
We regret that in our opinion neither the facts established in the instant case nor the law applicable thereto justify the conclusion reached by the District Judge.
The uncontradicted testimony of the witness, Sanders, who was the agent for Gross and Janes Tie Company, shows that he purchased manufactured ties, in what was known as the Ruston territory, from some 16 to 18 tie mills. Of these mills Gross and Janes had purchased and resold six, to various people, on terms similar to the transaction between the company and McAllister. Gross and Janes Tie Company is not shown to have been directly engaged in the manufacture of ties but rather, according to the record, its business is confined exclusively to the purchase of manufactured ties. Obviously it was to the interest of the company during a period of great demand to keep as many operators as possible engaged in the cutting and sawing of ties in order to supply the company with its needs. The District Judge inferred, from the circumstances of the liberal terms accorded McAllister, the existence of a scheme designed to save Gross and Janes Tie Company from the payment of compensation premiums. This inference the District Judge attempted to support by the interpretation of the agreement between the Harveys and Gross and Janes' agent, Sanders, as a purchase of timber for Gross and Janes, and by the further circumstance of the deduction for stumpage and the direct payment by Gross and Janes to the Harveys.
We do not think any of these facts are fairly susceptible of the interpretation thus placed upon them. As we have pointed out, the interests of Gross and Janes comprehended practical assistance to operators. There are any number of reasonable explanations for the requirement by the company of a demand note, none of which ought properly to be construed as evidences of a scheme. As to the purchase of the timber on the Harvey tract, in reality there was no binding sale, as such. The verbal agreement between Sanders and the Harveys was that payment at a stipulated price per tie would be made by Gross and Janes if, as and when timber was cut from the tract. According to the undisputed testimony *Page 577 
of the witness, Harvey, there was neither an obligation to cut the timber on the part of Gross and Janes nor an obligation on the part of the Harveys to permit such cutting.
And, as to the withholding of the agreed price, again we find that the testimony of witnesses, without contradiction, conclusively established the fact that such a procedure, as well as the withholding of hauling costs, is a matter of custom which is followed in the great majority of instances.
We think the interpretation of the facts established in this case as reflecting the concoction of a "refined scheme" is too strained to bear close examination. Particularly is this true when we consider that the only purpose of such a design would be to save insurance premiums on a comparatively small number of employees engaged in the operation of a half dozen small tie mills.
Counsel for defendant argues in brief before this Court that the trade and business of Gross and Janes Tie Company is not covered by Workmen's Compensation Statute, Act No. 20 of 1914, since its business of purchasing cross-ties is not of a hazardous nature.
There is nothing in the record which would disprove this contention except an interpretation of the facts in such manner as would justify a finding as to a concocted scheme. We do not so interpret the facts before us. This Court would not under any circumstances lend itself to stamping with its approval any plan which would reasonably appear to have been designed for the purpose of defeating the rights of an injured employee, but neither will it lend itself to the condemnation of what appear to be reasonable, sound and fair business practices in an attempt to seek out and impose liability upon a party removed and distinct from any real connection with or responsibility for the circumstances made the basis of a compensation claim.
Zealous counsel for plaintiff has cited a number of authorities upon which he relies in support of his contentions, among which we find Wilson v. Roberts et al., La. App., 194 So. 88; Seabury v. Arkansas Natural Gas Corporation, 171 La. 199,130 So. 1; Carter v. Colfax Lumber Creosoting Co. et al., 9 La. App. 497, 121 So. 233; Owers v. Louisiana Long Leaf Lumber Co., La. App., 14 So.2d 275; and Hatch v. Industrial Lumber Co., La. App., 199 So. 587, 589.
We find nothing in the cited cases which would support the claims of liability as asserted against this defendant. On the contrary our interpretation of the facts reflected in the cases set forth and the application of the sound principles enunciated by the courts with reference thereto resolves the authorities in support of our conclusion herein.
Particularly do we feel that the reasoning of the Court in the case of Wilson v. Roberts, supra, is applicable to the issue before us since, in the cited case, the Court stressed the character and nature of the business of the company which was made defendant as the alleged principal. In the instant case, as we have above noted, there is nothing in the record to indicate that Gross and Janes was engaged in any business save and except as a purchaser of cross-ties.
Similarly in the case of Hatch v. Industrial Lumber Company, supra, the following quotation from the opinion of the Court is pertinent: "Because of the facts and circumstances related above, learned counsel for plaintiff would have us conclude that there was no bona fide sale of this pulpwood by Brown to the defendant, but that the former was merely an interposed party disguised as a vendor, when in fact he was in reality nothing more than the agent or contractor of the defendant company; that the defendant arranged for the purchase of the timber and financed Brown in cutting and hauling it, and that the difference in the stumpage price paid Turner and the price paid Brown was nothing more than the allowance made to Brown for cutting, hauling and loading the wood."
Much the same contentions are urged in this case for, in effect, it is argued that Gross and Janes was in reality the owner of the timber on the Harvey tract by purchase; *Page 578 
that it was in fact the owner of the mill, and that McAllister was simply an employee or contractor of the company.
In our opinion, none of these facts are borne out by the preponderance of the testimony in the case. The alleged "sale" of the timber under the facts which we have above pointed out had no bearing upon the relationship between Gross and Janes and McAllister. Although the District Judge appeared to attach significance to the fact that Sanders had told Harvey that "he had a man he would move down there", or words to that effect, we fail to see how such an innocent, colloquial expression can be construed as supporting the conclusion that McAllister was in the employ of Gross and Janes. The testimony makes the situation perfectly clear that McAllister, who had bought a mill from Gross and Janes, was "bogged down" at his then location near Choudrant and needed another and more accessible site for his operations. Sanders' activity in locating timber which McAllister could cut obviously served the double purpose of giving McAllister the opportunity to pay on his indebtedness to Gross and Janes, and offered Gross and Janes a new source of supply of the product, cross-ties, which it was interested in purchasing.
In this case there is no question but that McAllister was the bona fide owner of the mill at which plaintiff was employed. Plaintiff testified that he was employed and paid by McAllister. In the obvious attempt to bolster his case plaintiff testified that he was frequently carried to work by Sanders, the agent for Gross and Janes, along with other employees, and that the ties were hauled from the millsite by a Gross and Janes truck on which the name of said Company was painted. This testimony is conclusively refuted not only by the testimony of defendant's witnesses but by witnesses who testified on behalf of plaintiff. It is definitely established that McAllister himself hauled his employees to and from work except on one single occasion when Sanders, as a favor, transported the employees, McAllister's truck being out of running order. It is also established beyond any question that no ties were hauled by Gross and Janes' truck but that all were hauled by the Harveys in their own truck, and, in fact, aside from the clearly erroneous testimony of plaintiff there does not appear to have been any truck of Gross and Janes concerned with any of the affairs in connection with the operation of McAllister's mill.
McAllister was in charge of hiring, firing, paying and supervising his employees; he was under no obligation to report to Gross and Janes on any matter; his only relation with Gross and Janes consisted of a verbal understanding to the effect that he would sell them the entire tie output of his mill. McAllister sold the lumber which he sawed at the mill for his own account.
On the whole we cannot readily conceive of a clearer picture of the affairs of a small independent sawmill operator whose only relations with defendant's insured were predicated upon fair, reasonable and mutually advantageous business agreements.
Our conclusions as to the character of the relationship which existed between McAllister, on the one hand, and Gross and Janes, on the other, is substantially strengthened by the fact that exactly the same character of relationship is shown to have continued between Barrett, as the purchaser of the mill from McAllister, and the Gross and Janes Company. The plain and uncontradicted testimony of Barrett was to the effect that he became the owner of the mill by purchase from McAllister for the considerations which we have above noted; that Gross and Janes had no interest in the ownership of the ties until after they were manufactured and delivered; that Gross and Janes held out stumpage and hauling costs and paid him the difference; that he sold the lumber to whomsoever he desired; that Gross and Janes had nothing whatsoever to do with the hiring, firing and payment of employees, nor with the supervision of operations of the mill.
All of this testimony is squarely in line with exactly the same nature and character of testimony given by McAllister, and cannot, in our opinion, be disregarded in favor of an assumption that all of these established *Page 579 
details were component parts of a scheme on the part of Gross and Janes to avoid paying insurance premiums.
We think clearly there is manifest error in the judgment appealed from, and, for the reasons set forth, it is accordingly reversed, annulled and set aside, and there is now judgment in favor of defendant rejecting plaintiff's demands at his cost.
KENNON, J., absent.